IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 12, 2008

## STATE OF TENNESSEE v. DARYL DEWITT GODWIN

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-405     Donald H. Allen, Judge**

_____

**No. W2008-00346-CCA-R3-CD - Filed December 2, 2008**

_____

The defendant, Daryl Dewitt Godwin, pled guilty to theft of property over $60,000, a Class B felony, and was sentenced as a Range I, standard offender to ten years in the Department of Correction. On appeal, the defendant argues that the trial court erred in denying alternative sentencing. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Gregory D. Gookin, Assistant Public Defender, for the appellant, Daryl Dewitt Godwin.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the defendant's obtaining money over a three-year period from the elderly victim, in part, under the pretext that the money was needed so the defendant could obtain treatment for cancer. The defendant pled guilty to theft but requested a bench trial to determine the amount of theft and his sentence.

The facts of the case concerning the theft as recited by the State at the plea acceptance were as follows:

> [The defendant] became acquainted with the victim, Mr. Elliot, . . . several years ago when [the defendant] began doing some work for Mr. Elliot around his house, yard

work and maintenance kind of stuff around his house for which he was receiving money and payments. At some point between March of '04 and March of '07 when this case came to light, [the defendant] informed Mr. Elliot that he had cancer and that he needed money for treatment, travel, medical care and that type of thing. Mr. Elliot then over the course of time gave [the defendant] money under the pretext that [the defendant] had cancer and needed that money for that. And, of course, the amount the Court is going to determine here in just a moment, but, [the defendant] I believe several times had promised Mr. Elliot that he would pay him back but never has given Mr. Elliot any money back to the State's knowledge.

Thus the State would show at trial that [the defendant] did unlawfully obtain or exercise control over property without the effective consent of the owner being Mr. Elliot with intent to deprive the owner of the property. [The defendant] gave a statement in this matter . . . which he does admit that he did tell Mr. Elliot that he had cancer and he did receive money because of telling him that.

At the bench trial, the victim, eighty-eight-year-old Alexander Harold Elliot, testified that he hired the defendant to do yard work and other household chores approximately five years earlier. At some point, the defendant told Elliot that he had cancer so Elliot started writing checks to the defendant for his medicine. When the defendant needed larger amounts, Elliot would draw against his investment account so he could write checks to the defendant for those larger amounts. Elliot stated that he also "paid fines to get [the defendant] out of jail or to keep him out of jail," paid attorney's fees, and occasionally purchased clothing or food for the defendant and his family. Elliot said he helped the defendant because he was a good worker, and the defendant had promised to repay him out of a "large accumulation of money" the defendant expected to acquire.

Elliot testified that he would not have given the defendant such a large sum of money had the defendant not told him he had cancer, and he did not remember the defendant ever telling him that he did not have cancer. Elliot could not estimate how much money he gave the defendant specifically for cancer treatment or medicine. Elliot kept a record of the money he loaned to the defendant from September 2004 to February 8, 2005, and it totaled $128,930. Elliot said that amount did not include any payments to the defendant for services rendered. Even though he continued to loan the defendant money through 2006, Elliot did not keep specific records of the amounts but guessed that year "was probably the biggest of all" because "[t]hat's when so much of this cancer business came up." Elliot looked at the expense register for his investment account and noted three voided checks made out to the defendant in 2006. Elliot explained that when a check was voided it was "usually [because] they ask[ed] that [the checks] be issued in a different name or something strange" and he would write a new check but usually out of a different account. Asked if he gave the defendant the money represented by the voided checks because the defendant had cancer, Elliot said, "I guess that had something to do with it. I was trying all along to help him . . . but when it continued to such an extent it was on a basis of his promise . . . that he had all this money coming that he'd pay me back with."

On cross-examination, Elliot acknowledged that one check he wrote on the defendant's behalf to a lawyer was refunded to him because the defendant decided he did not want to be

represented by that lawyer. However, Elliot remembered that he paid two other lawyers on the defendant's behalf and was not reimbursed for those amounts. Elliot acknowledged that every time he gave the defendant money in 2006 was "[n]ot necessarily" based on the defendant's telling him he had cancer. Elliot did not recall the defendant ever telling him he was homeless. On redirect examination, Elliot testified that he "[p]ossibly" would have helped the defendant some had the defendant not told him he had cancer but not to the same extent.

Private Investigator Jack Wallace testified that in January 2007 attorneys at a local law firm asked him to go to a Dr. House's residence and pick up a letter to deliver to the defendant and his family. He said that Dr. House was a friend of Elliot and the letter to the defendant was in "reference to his association with Mr. Elliot." Wallace and Dr. Ben House went to visit Elliot before delivering the letter to the defendant, during which Elliot "produced . . . a type written document that he said he had typed up in 2004 and it was to whom it may concern. The note stated that he had given approximately $125,000 to [the defendant] since he had met him a couple of years previous." Wallace recalled that Elliot also showed him other documents recording the amount of money given the defendant, and one document showed an excess of $30,000 in one month. Wallace stated he did not know where all the documents were currently located because Elliot "insisted on keeping his own records."

Upon learning this information, Wallace determined that the situation was different than originally thought so he decided not to deliver the letter to the defendant, but instead took Elliot to meet with the attorneys the following day. The attorneys prepared a new letter for Wallace to deliver to the defendant and his wife informing them to "cease having any contact with Mr. Elliot . . . [or] they were going to turn it over to the authorities." Wallace located the defendant's wife at a motel and gave her a copy of the letter. He discovered that the defendant was incarcerated but was able to interview him when "he returned from a work detail." Wallace testified that the defendant told him he was going to leave Elliot alone when he got out of jail because he felt he had taken advantage of him. Wallace asked the defendant "where all the money had gone," and the defendant shrugged his shoulders. Wallace also commented to the defendant that he "appear[ed] to have made a remarkable recovery" from cancer, and the defendant did not respond.

Investigator Chad French with the Jackson Police Department testified that he became involved in the case in April 2007 when an assistant district attorney requested his presence at a meeting with Elliot and one of Elliot's acquaintances or family members. During that meeting, Investigator French learned about the situation involving Elliot and the defendant and, on that basis, collected evidence and issued a warrant for the defendant's arrest. Investigator French interviewed the defendant once he was in custody, and the defendant gave a formal statement. In his statement, the defendant admitted telling Elliot he had cancer and estimated that he received over $200,000 from Elliot. The defendant stated that Elliot had also bought him food, two cars, and paid his bills. The defendant said he told Elliot he had cancer because he "was homeless and needed money." Investigator French examined a medical questionnaire filled out by the defendant upon his intake into jail in August 2006, and an "N," indicating "no," was marked next to the question asking if the defendant had cancer.

The defendant testified that he first met Elliot in 2004 or 2005 when he started doing yard work in Elliot's neighborhood. Elliot then hired the defendant to do yard work and household chores approximately seven times a month. The defendant said that Elliot bought his family groceries and clothes at times and once rented them an apartment when they were homeless.

The defendant testified that he never took anything from Elliot that Elliot did not give him. The defendant admitted that Elliot had purchased three or four cars for him when he said he needed transportation. The defendant remembered that he told Elliot he had cancer in "about '05" when he was homeless and that the checks Elliot wrote to him in 2004 with the notation "medicine for [the defendant]" were not all for cancer. The defendant said he told Elliot he did not have cancer a few months later because "[he] felt bad telling him that" but claimed Elliot wanted to help him anyway. The defendant testified that he "felt bad" for continuing to take money from Elliot but explained, "It's like a kid, a baby, as long as you give them money, you are going to take it. . . . It's been times that I'm just lying in the bed and he'll call and ask me what I needed." The defendant estimated that Elliot only gave him $2,000 for cancer-related treatment, travel, and medicine.

The defendant stated that Elliot continued to help his family while he was in jail during the latter months of 2006 and into 2007. Asked what he did with all the money Elliot gave him, the defendant responded that he bought furniture and cars. The defendant agreed he received a letter telling him to have no further contact with Elliot but said:

> [I]t's been times that Mr. Elliot would come and pick me up . . . and I'll say, "Mr. Elliot, you know we don't supposed to be together." He said, "That's fine. It's my money." And then he would tell me that he wished they would quit riding him so hard. And there's been times he would come pick me up and I would be scared to go over to his house and he would pull me under his garage and shut the door down to keep people from seeing me and I told him I wasn't comfortable and he said it would be all right.

On cross-examination, the defendant stated that he told Elliot he had cancer even though Elliot had already been giving him money because he wanted "[t]o get more money." Asked if Elliot gave him more money than he had been once he told him he had cancer, the defendant answered, "Uh-huh." The defendant said he had been trying to get on disability since the 1990's for "[n]ervous and just depression" and told Elliot he would repay him once that was approved. The defendant claimed he was told his disability had been approved "[a]bout three or four years ago," but he had never received any money.

The defendant testified that he had repaid Elliot "some hundreds of dollars." Asked how much, the defendant said, "I ain't gonna lie. In all when I had worked[,] the[] only thing I had put in his hand was about [$]500." The defendant acknowledged that he was working for other people while Elliot was giving him money. The defendant admitted that he served ten months in jail in 2006 and approximately two and a half months in 2005. On redirect examination, the defendant stated that he was arrested on the matter in this case in April 2007 and had been out on bond since August 21, 2007.

-4-

After hearing the proof, the court found the defendant guilty of theft over $60,000, revoked his bond, and scheduled the matter for sentencing. At the sentencing hearing, the defendant testified that he was sorry for taking advantage of Elliot and was willing to pay restitution. The defendant said that he had a drug problem with marijuana and cocaine from 2004 through 2006. He admitted that he had several prior misdemeanor convictions, including thefts, driving violations, a drug charge, and driving under the influence. The State introduced the defendant's presentence report into evidence. At the conclusion of the hearing, the trial court sentenced the defendant as a Range I offender to ten years in the Department of Correction. The court also ordered that the defendant pay restitution to Elliot in the amount of $128,930.

## ANALYSIS

On appeal, the defendant argues that the trial court erred in denying alternative sentencing. The State responds, first, that the appeal should be dismissed for failure to file a timely notice of appeal or, in the alternative, that the trial court properly denied alternative sentencing. We must first address whether the defendant's notice of appeal was timely filed.

### Timeliness

The State argues that the appeal should be dismissed as untimely. In order to address this issue, a summary of the relevant dates is necessary. The trial court entered judgment in the defendant's case on December 20, 2007; the defendant filed a motion for new bench trial on December 21, 2007; the trial court denied the motion for new bench trial on January 25, 2008; and the defendant filed a notice of appeal on February 13, 2008. The State, citing Tennessee Rule of Appellate Procedure 3(e), argues that because a motion for new trial is a necessity only in cases tried by the jury and this was a bench trial, the defendant only had thirty days from December 20, 2007, the date judgment was entered, in which to file his notice of appeal. The State, however, provides no support for this proposition.

If we were to follow the State's logic, defendants in non-jury cases would in essence be forced to choose between either filing a timely appeal or filing a motion for new trial – except in those fortuitous cases where the motion for new trial was ruled upon still within the thirty-day limit giving such defendant an opportunity to also appeal. While we agree the defendant was not required to file a motion for new trial, see, e.g., State v. Isaiah Burton, Jr., No. M2005-00690-CCA-R3-CD, 2006 WL 1896364, at *7 (Tenn. Crim. App. July 7, 2006), perm. to appeal denied (Tenn. Nov. 6, 2006) (noting that "[b]ecause Defendant's trial was a bench trial, it was not required for him to file a motion for new trial pursuant to Rule 3(e) because it only applies to cases tried by a jury"), we cannot conclude that the drafters of the rules intended to, in effect, take that option away from him. Indeed, the language in our supreme court's opinion in McCormic v. Smith, 659 S.W.2d 804 (Tenn. 1983), is clear that defendants in non-jury cases have the option of filing a motion for new trial:

> Motions for a new trial have been optional, not mandatory, for many years in non-jury cases. Under Rule 59, T.R.C.P., a party may request a trial judge in a non-jury matter to reconsider actions which the judge has taken, but this is not, nor should it be, a prerequisite to appellate review of those actions.

Id. at 806 (footnotes omitted).  We also note that a review of our case law revealed a number of cases where a defendant, following a bench trial, filed a motion for new trial that was then followed by a timely notice of appeal.  See, e.g., State v. Harold Kay Smith, No. M2007-00408-CCA-R3-CD, 2008 WL 1822441  (Tenn. Crim. App. Apr. 23, 2008); State v. Jacqueline P. Warlick, No. M2005-01477-CCA-R3-CD, 2007 WL 1439648 (Tenn. Crim. App. May 17, 2007); State v. Timothy D. Prince, No. M2004-01262-CCA-R3-CD, 2005 WL 1025774 (Tenn. Crim. App. May 3, 2005). We will, therefore, consider the defendant's issue on the merits.

**Sentencing**

The defendant argues that the trial court erred in denying alternative sentencing.  He alleges that the circumstances of the offense "are not especially horrifying, shocking, or reprehensible," and "[a] more appropriate sentence . . . would have been a period of confinement in the county jail, followed by intensive probation supervision."

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40-35-401(d) (2006).  This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts.  State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).  However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.  In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

As the State points out, there exists no presumption in favor of alternative sentencing for an offender convicted of a Class B felony.  See Tenn. Code Ann. § 40-35-102(6) (2006).  Tennessee Code Annotated section 40-35-303(a) states that a defendant shall be eligible for probation, subject

to certain exceptions, if the sentence imposed on the defendant is ten years or less. Thus, the defendant was eligible for probation.[1] A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Another appropriate factor for a trial court to consider in determining whether to grant probation is a defendant's credibility or lack thereof, as this reflects on the defendant's potential for rehabilitation. Id. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456. "Denial of probation may be based solely on the circumstances of the offense when they are of such a nature as to outweigh all other factors favoring probation." Id.

A trial court may deny alternative sentencing and sentence a defendant to confinement based on any one of the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2006).

In sentencing the defendant, the trial court enhanced the defendant's sentence based on his previous history of criminal convictions and criminal behavior, that the victim was particularly vulnerable because of age, the amount of property taken from the victim was particularly great, his previous history of unwillingness to comply with the conditions of a sentence involving release in

---

[1] It is not clear from the record whether the defendant was sentenced under the pre- or post-2005 sentencing provisions. It appears that he was sentenced under the new law because the trial court discussed probation, and the defendant would not have been eligible under the prior law given his ten-year sentence. See Tenn. Code Ann. § 40-35-303(a) (2003) (stating that a defendant is eligible for probation if the sentence imposed is eight years or less).

the community, and his abuse of a position of private trust, see Tenn. Code Ann. § 40-35-114(1), (4), (6), (8), (14), and gave each factor "great weight." In mitigation, the court gave "some weight" to the fact the defendant's actions did not involve any kind of threat of serious bodily harm or injury. See id. § 40-35-113(1). The court noted that the defendant had "apologized to Mr. Elliot at the trial" but questioned whether "he really thinks he did anything wrong" and also noted that the defendant "did plead guilty as far as the theft." The court determined that it "really [did not] see any strong mitigating factors." The court concluded that a Range I, ten-year sentence, as well as restitution, was appropriate.

With regard to the manner of service, the court found that confinement was necessary to avoid depreciating the seriousness of the offense and that measures less restrictive than confinement had been used recently and frequently on the defendant "without success." The court said this was "a very, very serious offense[] involving theft by deception whereby this defendant . . . basically took advantage of an elderly gentleman, Mr. Elliot, over a period of several years and he was able to receive money from the victim by deception by alleging that he had cancer and so forth . . . ." The court noted that the defendant had received suspended sentences in the past, had committed a number of offenses in February 2006 while out on bond on another case, and had committed offenses in June 2006 while on probation. The court concluded, in pertinent part, as follows:

> [The defendant] has proven previously after being granted probation that he can't follow the rules of probation. He has violated the rules of probation and he's been revoked on those misdemeanor sentences. I just don't find that this defendant is an appropriate candidate for any type of alternative sentencing. The Court finds that he should serve this ten year sentence as imposed.
>
> Now, I've looked at this very carefully. I understand although this defendant doesn't have any prior felony convictions, the circumstances involved in this case along with this extensive misdemeanor criminal history clearly indicate that [the defendant] is not amenable to probation.

We conclude no error exists in the trial court's sentencing determination. The presentence report lists twenty-three misdemeanor convictions beginning when the thirty-six-year-old defendant was nineteen years old. As noted by the trial court, the defendant had received probation and community corrections for previous convictions and continued to commit offenses while on probation. In addition, the trial judge, who was in the best position to determine the defendant's attitude and demeanor, concluded that he was "not sure [the defendant is] really remorseful about what he did. I think he's sorry he got caught. I'm not sure he really thinks he did anything wrong." Both a lack of candor and an unwillingness to accept full responsibility for one's actions are relevant considerations in determining a defendant's potential for rehabilitation. State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992).

**CONCLUSION**

We conclude that the record supports the trial court's denial of the defendant's request for an alternative sentence. Accordingly, we affirm the ten-year sentence of confinement imposed by the trial court.

_____
ALAN E. GLENN, JUDGE